JAMES L. TOLIVER,

        Petitioner,

v.                                             Case No. 3:14-cv-106-J-32JRK

SECRETARY OF THE FLORIDA
DEPARTMENT OF CORRECTIONS, et al.,

        Respondents.

_____

## ORDER

## I.  Status

Petitioner initiated this action by filing a pro se Petition Under 28 U.S.C. § 2254 for a Writ of Habeas Corpus (Doc. 1) on January 21, 2014. He is currently proceeding on an Amended Petition (Doc. 25) (Amended Petition). He challenges a 2006 state court (Duval County, Florida) judgment of conviction for second degree murder. Petitioner is serving a sentence of life imprisonment with a minimum mandatory term of imprisonment of 25 years.

Respondents filed a response to the Amended Petition and relied on the exhibits attached to the original response. See Respondents' Answer in Response to Order to Show Cause and Petition for Writ of Habeas Corpus (Doc. 33) (Response); Exhibits (Docs. 17-1 to 17-14) (Ex.).[1] After the Response was filed, Petitioner retained counsel to represent him. On June 30, 2017, Petitioner, through counsel, filed a substantive Reply (Doc. 42) (Reply),

_____

[1] Respondents argued that the Petition was untimely filed, but the Court previously found the Petition was timely filed. See Order (Doc. 39).

in which he abandons all grounds "except for that part of amended ground two . . . which alleged that [Petitioner] was denied effective assistance of counsel based on his counsel[] having failed to timely present to the State his acceptance of the proposed plea agreement (which had capped his sentence at eighteen years imprisonment), which delay resulted in the State withdrawing the plea offer." Respondents assert that this ground is not properly exhausted, "refuted by Petitioner's own filing," and untimely.[2] Response at 16. The case is now ripe for review.[3]

## II. Pertinent Procedural History

During Petitioner's post-conviction proceedings, he filed a Rule 3.850 motion, which he subsequently amended on two occasions. In his second amended Rule 3.850 motion, he raised five grounds. In the third ground, he argued that his trial counsel was ineffective for advising him to reject a plea agreement of 1 to 18 years. Specifically, he argued:

---

[2] Respondents argue that the claim is untimely because it was not raised in the original Petition and does not relate back. Given the Court's findings herein, the Court need not address the untimeliness argument.

[3] "In a habeas corpus proceeding, the burden is on the petitioner to establish the need for an evidentiary hearing." Jones v. Sec'y, Fla. Dep't of Corr., 834 F.3d 1299, 1318 (11th Cir. 2016) (citing Chavez v. Sec'y Fla. Dep't of Corr., 647 F.3d 1057, 1060 (11th Cir. 2011)). "In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." Schriro v. Landrigan, 550 U.S. 465, 474 (2007) (citation omitted). "It follows that if the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing." Id. The pertinent facts of this case are fully developed in the record before the Court, and "further factual development" is not necessary. Turner v. Crosby, 339 F.3d 1247, 1275 (11th Cir. 2003). Thus, an evidentiary hearing will not be conducted.

Prior to trial [Petitioner's] trial counsel, Ms. Jennifer Bowens,[4] (hereinafter counsel) came to the [Petitioner] with a plea agreement of 1 to 18 years in prison, which was being offered by the State. Counsel told the [Petitioner] that in her professional opinion, she believed that the [Petitioner] had a very good chance of being found not guilty of the crimes charged. Had [Petitioner] accepted the above noted plea, he would have been required to serve a minimum of twelve and three quarter . . . years in prison. However, after accepting trial counsel[']s legal guidance, [Petitioner] rejected the plea, went to trial and upon being found guilty was sentenced to a term of imprisonment of life, with a mandatory 25 years before becoming eligible for parole. Counsel's affirmative misadvice prejudiced the [Petitioner] by influencing his decision to reject a plea offer that would have allowed him to eventually obtain his freedom.

Ex. P at 819.[5]

The state court summarily denied grounds one and five of the second amended Rule 3.850 motion, and set an evidentiary hearing on grounds two, three, and four. See Ex. P at 848-49. After the evidentiary hearing was set, Petitioner retained Rick Sichta, Esquire to represent him. See id. at 859. Prior to the evidentiary hearing, Petitioner, through counsel, filed a third amended Rule 3.850 motion, which incorporated grounds one through five[6] of Petitioner's pro se second amended motion, and added grounds six through eight. See id. at 868-92. Grounds six through eight raised additional ineffective-assistance-of-trial-counsel claims.

_____

[4] Ms. Bowens' surname changed after the trial. Throughout the record, she is referred to interchangeably as Ms. Bowens and Ms. Dickens.

[5] Petitioner also raised this claim in his original and amended motions. See Ex. P at 761, 788.

[6] Counsel incorporated grounds one through five, despite the state court having already summarily denied grounds one and five.

At the evidentiary hearing, Petitioner, his trial counsel (Ms. Bowens / Dickens), and his trial co-counsel testified (Charles Fletcher, Esquire). See id. at 931-95. Relevant to the claim pending before this Court is the following testimony by Petitioner:

> Q.    Were there any plea bargains in this case? Were there any offers or any kind of deals trying to be worked out instead of going to trial?
>
> A.    Yes. What happened is Jennifer told me that it was a plea bargain of zero to 18, but she also told me that if we went to trial that we could win it, and she also told me that if we went to trial and if we won the trial they were going to charge me with 30 years. I mean, take me to trial again and try me and I would get 30 years for the gun.
>
> . . . .
>
> Q.    Mr. Toliver, I'm showing you what has been marked as Defendant's Exhibit A . . . . What is that?
>
> A.    That's the plea bargain. That's the plea bargain for the zero to 18 years, as from Jennifer.
>
> . . . .
>
> I was putting everything in Jennifer's hand because I didn't know whether to take the plea bargain or not, because she told me, exactly what she told me, if we go to trial we can win it.
>
> . . . .
>
> Q.    Did you sign this document?
>
> A.    Yes, I did. When I signed that document it was about six weeks before trial. My son Baron went to Jennifer about six weeks before trial and **asked her to come with some kind of plea bargain, you know, come up with a plea bargain with me because it looked like that if I went to trial he thought maybe that I will lose, so we came up with that plea bargain. And then it was close to - - it was six weeks**

4

**before trial, and so that's when we come up with our plea
bargain, and we had pled out on zero to 18.**

Q. And was that plea bargain accepted by the State
Attorney's Office?

A. Jennifer come to me and then she told me it was
not accepted because it was too close to trial.

. . . .

Q. Were there any other plea bargains or
negotiations between the State Attorney's Office, other than
the one we just talked about, during the pendency of your
case?

A. No, not as I know of, no.[7]

Q. Did you receive any correspondence or letters
from Ms. Bowens indicating that there was plea offers being
negotiated?

A. No, not as - - not as I know of.

. . . .

Q. And did you try to get rid of the HO [(habitual
offender)] status during your plea negotiations? Were you
concerned about your HO status?

A. Yes, I was real concerned about it, but like I say,
I was putting everything in Jennifer's hand. I didn't know.

. . . .

Q. How did that affect your plea bargaining and what
deal you would have taken?

---

[7] In Petitioner's brief on appeal from the denial of his Rule 3.850 claims, Petitioner noted
that "[d]uring pre-trial proceedings, several attempts were tendered in an effort to reach a
negotiated plea agreement, however, no agreement was reached due to counsel's advi[c]e
that an acquittal was reachable and Toliver's belief in counsel's ability to argue for a lesser
included offense." Ex. Q (Doc. 17-12 at 126).

A.      Well, see, I'm thinking that if I would have found that I wasn't HO that would have been - - it would have been a lesser sentence for me to plea out on than zero to 18 years.

Q.      Did you want to plea?

A.      Yes, I wanted to plea, because I wanted to plea because it was - - the incident, it was an accident, and I know by an accident you're going to get some time. It was an accident. It was that.

. . . .

Q.      . . . Did you ever reject any plea offers . . . that w[ere] brought to you by Ms. Bowens?

A.      No, I didn't, but what - - what had happened is, I was putting everything into Ms. Bowens' hand. Whatever she told me, I would have did it, because she was my lawyer, but if she would have come to me and told me I had to, that would - - if I wouldn't have took the plea bargain and went to trial and I would have lost, I would have took the plea bargain.

. . . .

Q.      And when she presented you with the blue form that she herself wrote up, did you sign it right away?

A.      Yes.

Ex. P at 940-43, 945, 947-48, 953-54 (emphasis added).

Petitioner's trial counsel, Ms. Bowens / Dickens, also testified.

Q.      Any of the plea negotiations you might have had were done solely with Mr. Heavener [(the state prosecutor)]?

A.      There was a call with Mr. Bateh, and at some point, I did not speak to Mr. Guy directly, but **Mr. Heavener . . . told me that whatever was negotiated would have to be cleared by Mr. Guy or another supervisor**. . . .

. . . .

6

Q.      Did you and Mr. Toliver ever have a conversation about any kind of plea bargains?

A.      Multiple conversations.

Q.      I don't want you to guess, but your best estimate, how many times was a plea talked about in the pendency of this case?

A.      Well, I went over to see him at least 18 times that I noted. I have a recollection. I might not have noted all of them. I would say probably half of the times I went and talked to him we were bantering about how we could resolve the case short of a trial, and so I would venture to say nine, ten times probably, that's at the jail, and I know when I saw him over in court it was always a topic.

Q.      And we spoke previously and you're well aware of the blue form that has been introduced into evidence already. Was there any other blue forms or plea negotiations that were written down on paper or correspondence or so on and so forth that you remember?

A.      I recall writing out personally a few different plea forms, **but I went to Mr. Toliver and he was not interested**, then I would rip them up because I didn't want confusion. I didn't want anyone else to sign it and, you know, so I - - the only one that came to real fruition, that I tendered, I believe, was the one that has now been entered into evidence, but there were other ones that I drafted.

Q.      And it goes without saying that those did not work?

A.      Right.

Q.      Why was that?

A.      I was in constant negotiations with Mr. Heavener, constantly, and we went back and forth and he wouldn't - - he wasn't as open minded to some of the things I was suggesting, and if he was and Mr. Heavener was giving me the inclination that he might consider it, **then it was Mr. Toliver at that point**

**that wasn't wanting to consider it**. So that's - - I might have lost your question, but that's why nothing ever really went anywhere.

If Mr. Heavener gave me a suggestion, I would write it on a blue form and bring it over. If Mr. Toliver wasn't interested, I would throw it away. On another day Mr. Toliver might have been wiling to do zero to 15, and I would draft it up and then I'd talk to Mr. Heavener on the phone and he'd say, don't even bring it to me. . . .

Q.      . . . Other than the zero to 18 range that we talked about in the blue form that's in evidence, what other ranges were there?

A.      Mr. Heavener talked about . . . a plea for 25 years, and I told him that wasn't going to work. Mr. Heavener talked about 20 at some point, like 10 to 20, and I said that we needed something below 20. And then we finally, **at some point months prior to it actually being signed, we had as firm of a plea agreement as you could get between two attorneys for zero to 18, it was just under 20. [Mr. Heavener] didn't unequivocally agree to it, but he said, if you get it signed and bring it to me today or tomorrow, I will show it to my superiors and I will try to encourage them to accept it, but when I did that Mr. Toliver was not inclined to accept it at that time. That went off the table.**

And so as trial neared, I think I brought up let's just, **I know Mac [(Heavener)] had rejected it because you didn't bring it at an earlier fashion**. We can try one more time and see if he'll accept it, if you're so inclined. I never urged him one way or the other. I advised him on possible outcomes. **And at that point, on the nearing of eve of trial, six weeks prior, Mr. Toliver wanted to sign, and when I took it to [Mr. Heavener,] he said it's too late.**

. . . .

**My feeling of Mr. Toliver all along was that he wasn't really interested in a plea resolution. It wasn't until his son and I spoke that that might be something he should really**

8

**consider that he started to consider it, but he still wasn't on board until right before trial.**

. . . .

Q.      Did you ever tell Mr. Toliver to reject a plea of zero to 18 because you felt that he would win his case at trial?

A.      No.

Q.      Did you advise him of any and all offers that the State made?

A.      Absolutely.

Ex. P at 961, 964-69 (emphasis added).

The state court entered a written order denying Petitioner's claim:

[Petitioner] claims that one of his trial attorneys was deficient in advising him to turn down a plea offer from the State of eighteen (18) years in prison. Because he turned down such offer, instead going to trial, he was convicted and sentenced to life in prison. The Court finds, though, that the advice given Defendant by this lawyer was totally appropriate under the circumstances. The Defendant made his own decision to go to trial, after considering all the pros and cons on the subject.

Ex. P at 919.

Petitioner appealed, and filed a pro se initial brief. Ex. Q. He framed his third ground on appeal as follows: "Whether the trial court erred in denying ground three of [Petitioner]'s Second Amended motion, that counsel[] misadvised the [Petitioner] regarding a plea agreement, and/or that counsel failed to timely present the agreement to the state prosecutor, because counsel believed the case was winnable or at the very least a verdict on a lesser charge would be rendered." Ex. Q at 14 (capitalization omitted). He argued that he "signed a plea agreement in the presence of Counsel Bowens approximately six (6)

weeks prior to the beginning of trial." Id. Petitioner argued that his counsel "waited until just days prior to trial, signed and dated the plea bargain on April 11, 2006, [trial commenced on April 24, 2006], and brought the agreement to Mr. Heavener who said it was too late." Id. at 15.

The State filed a substantive answer brief. Ex. R. The State argued that the appellate court must defer to the well-supported findings of the trial court and affirm on the claim that was actually presented to the trial court. See id. at 36-37. The State further argued that Petitioner was presenting to the appellate court the exact opposite argument he presented to the trial court. See id. at 38 ("Now, instead of contending that counsel was ineffective in misadvising him to reject the State's offer, [Petitioner] argues that six weeks prior to trial he had agreed to accept the State's plea offer, but because counsel failed to timely notify the State of his acceptance, the State withdrew the offer which forced him to go to trial."). Thus, the State contended that the "new" argument Petitioner presented on appeal was not preserved. See id. at 39.

Petitioner filed a pro se Reply. Ex. S. On March 12, 2010, the First District Court of Appeal entered a per curiam affirmance without a written opinion. Ex. T. Petitioner filed a motion for rehearing, Ex. U, which was denied, Ex. V. The mandate issued on May 11, 2010. Ex. W.

### III. Governing Legal Principles

#### A. Standard of Review

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) governs a state prisoner's federal habeas corpus petition. See Ledford v. Warden, Ga. Diagnostic &

10

Classification Prison, 818 F.3d 600, 642 (11th Cir. 2016), cert. denied, 137 S. Ct. 1432 (2017). "'The purpose of AEDPA is to ensure that federal habeas relief functions as a guard against extreme malfunctions in the state criminal justice systems, and not as a means of error correction.'" Id. (quoting Greene v. Fisher, 565 U.S. 34, 38 (2011)).

The first task of the federal habeas court is to identify the last state court decision, if any, that adjudicated the petitioner's claims on the merits. See Marshall v. Sec'y Fla. Dep't of Corr., 828 F.3d 1277, 1285 (11th Cir. 2016). The state court need not issue an opinion explaining its rationale in order for the state court's decision to qualify as an adjudication on the merits. See Harrington v. Richter, 562 U.S. 86, 100 (2011). Where the state court's adjudication on the merits is unaccompanied by an explanation,

> the federal court should "look through" the unexplained decision to the last related state-court decision that does provide a relevant rationale. It should then presume that the unexplained decision adopted the same reasoning. But the State may rebut the presumption by showing that the unexplained affirmance relied or most likely did rely on different grounds than the lower state court's decision, such as alternative grounds for affirmance that were briefed or argued to the state supreme court or obvious in the record it reviewed.

Wilson v. Sellers, 138 S. Ct. 1188, 1192 (2018).

When a state court has adjudicated a petitioner's claims on the merits, a federal court cannot grant habeas relief unless the state court's adjudication of the claim was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding,"

28 U.S.C. § 2254(d)(1), (2). A state court's factual findings are "presumed to be correct" unless rebutted "by clear and convincing evidence." Id. § 2254(e)(1).

> AEDPA "imposes a highly deferential standard for evaluating state court rulings" and "demands that state-court decisions be given the benefit of the doubt." Renico v. Lett, 559 U.S. 766, 773 (2010) (internal quotation marks omitted). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." Harrington v. Richter, 562 U.S. 86, 101 (2011) (internal quotation marks omitted). "It bears repeating that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." Id. [at 102] (citing Lockyer v. Andrade, 538 U.S. 63, 75 (2003)). The Supreme Court has repeatedly instructed lower federal courts that an unreasonable application of law requires more than mere error or even clear error. See, e.g., Mitchell v. Esparza, 540 U.S. 12, 18 (2003); Lockyer, 538 U.S. at 75 ("The gloss of clear error fails to give proper deference to state courts by conflating error (even clear error) with unreasonableness."); Williams v. Taylor, 529 U.S. 362, 410 (2000) ("[A]n unreasonable application of federal law is different from an incorrect application of federal law.").

Bishop v. Warden, GDCP, 726 F.3d 1243, 1253-54 (11th Cir. 2013) (internal citations modified).

### B. Exhaustion and Procedural Default

There are prerequisites to federal habeas review. Before bringing a § 2254 habeas action in federal court, a petitioner must exhaust all state court remedies that are available for challenging his state conviction. See 28 U.S.C. § 2254(b)(1)(A). To exhaust state remedies, the petitioner must "fairly present[]" every issue raised in his federal petition to the state's highest court, either on direct appeal or on collateral review. Castille v. Peoples, 489 U.S. 346, 351 (1989) (emphasis omitted). Thus, to properly exhaust a claim, "state prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking

one complete round of the State's established appellate review process." O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1999); see also Pope v. Rich, 358 F.3d 852, 854 (11th Cir. 2004) (noting "that Boerckel applies to the state collateral review process as well as the direct appeal process").

In addressing exhaustion, the United States Supreme Court explained:

> Before seeking a federal writ of habeas corpus, a state prisoner must exhaust available state remedies, 28 U.S.C. § 2254(b)(1), thereby giving the State the ""opportunity to pass upon and correct" alleged violations of its prisoners' federal rights."" Duncan v. Henry, 513 U.S. 364, 365, 115 S. Ct. 887, 130 L.Ed.2d 865 (1995) (per curiam) (quoting Picard v. Connor, 404 U.S. 270, 275, 92 S. Ct. 509, 30 L.Ed.2d 438 (1971)). To provide the State with the necessary "opportunity," the prisoner must "fairly present" his claim in each appropriate state court (including a state supreme court with powers of discretionary review), thereby alerting that court to the federal nature of the claim. Duncan, supra, at 365-366, 115 S. Ct. 887; O'Sullivan v. Boerckel, 526 U.S. 838, 845, 119 S. Ct. 1728, 144 L.Ed.2d 1 (1999).

Baldwin v. Reese, 541 U.S. 27, 29 (2004).

A state prisoner's failure to properly exhaust available state remedies results in a procedural default which raises a potential bar to federal habeas review. The United States Supreme Court has explained the doctrine of procedural default as follows:

> Federal habeas courts reviewing the constitutionality of a state prisoner's conviction and sentence are guided by rules designed to ensure that state-court judgments are accorded the finality and respect necessary to preserve the integrity of legal proceedings within our system of federalism. These rules include the doctrine of procedural default, under which a federal court will not review the merits of claims, including constitutional claims, that a state court declined to hear because the prisoner failed to abide by a state procedural rule.

> See, e.g., Coleman,[8] supra, at 747-748, 111 S. Ct. 2546; Sykes,[9] supra, at 84–85, 97 S. Ct. 2497. A state court's invocation of a procedural rule to deny a prisoner's claims precludes federal review of the claims if, among other requisites, the state procedural rule is a nonfederal ground adequate to support the judgment and the rule is firmly established and consistently followed. See, e.g., Walker v. Martin, 562 U.S. --, --, 131 S. Ct. 1120, 1127-1128, 179 L.Ed.2d 62 (2011); Beard v. Kindler, 558 U.S. --, --, 130 S. Ct. 612, 617-618, 175 L.Ed.2d 417 (2009). The doctrine barring procedurally defaulted claims from being heard is not without exceptions. A prisoner may obtain federal review of a defaulted claim by showing cause for the default and prejudice from a violation of federal law. See Coleman, 501 U.S., at 750, 111 S. Ct. 2546.

Martinez v. Ryan, 566 U.S. 1, 9-10 (2012). Thus, procedural defaults may be excused under certain circumstances. Notwithstanding that a claim has been procedurally defaulted, a federal court may still consider the claim if a state habeas petitioner can show either (1) cause for and actual prejudice from the default; or (2) a fundamental miscarriage of justice.

Ward v. Hall, 592 F.3d 1144, 1157 (11th Cir. 2010). In order for a petitioner to establish cause and prejudice,

> the procedural default "must result from some objective factor external to the defense that prevented [him] from raising the claim and which cannot be fairly attributable to his own conduct." McCoy v. Newsome, 953 F.2d 1252, 1258 (11th Cir. 1992) (quoting Carrier, 477 U.S. at 488, 106 S. Ct. 2639).[10] Under the prejudice prong, [a petitioner] must show that "the errors at trial actually and substantially disadvantaged his defense so that he was denied fundamental fairness." Id. at 1261 (quoting Carrier, 477 U.S. at 494, 106 S. Ct. 2639).

---

8  Coleman v. Thompson, 501 U.S. 722 (1991).

9  Wainwright v. Sykes, 433 U.S. 72 (1977).

10  Murray v. Carrier, 477 U.S. 478 (1986).

<u>Wright v. Hopper</u>, 169 F.3d 695, 706 (11th Cir. 1999).

In the absence of a showing of cause and prejudice, a petitioner may receive consideration on the merits of a procedurally defaulted claim if the petitioner can establish that a fundamental miscarriage of justice, the continued incarceration of one who is actually innocent, otherwise would result. The Eleventh Circuit has explained:

> [I]f a petitioner cannot show cause and prejudice, there remains yet another avenue for him to receive consideration on the merits of his procedurally defaulted claim. "[I]n an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default." <u>Carrier</u>, 477 U.S. at 496, 106 S. Ct. at 2649. "This exception is exceedingly narrow in scope," however, and requires proof of actual innocence, not just legal innocence. <u>Johnson v. Alabama</u>, 256 F.3d 1156, 1171 (11th Cir. 2001).

<u>Ward</u>, 592 F.3d at 1157. "To meet this standard, a petitioner must 'show that it is more likely than not that no reasonable juror would have convicted him' of the underlying offense." <u>Johnson v. Alabama</u>, 256 F.3d 1156, 1171 (11th Cir. 2001) (quoting <u>Schlup v. Delo</u>, 513 U.S. 298, 327 (1995)). Additionally, "'[t]o be credible,' a claim of actual innocence must be based on reliable evidence not presented at trial." <u>Calderon v. Thompson</u>, 523 U.S. 538, 559 (1998) (quoting <u>Schlup</u>, 513 U.S. at 324). With the rarity of such evidence, in most cases, allegations of actual innocence are ultimately summarily rejected. <u>Schlup</u>, 513 U.S. at 324.

### C. Ineffective Assistance of Counsel

"The Sixth Amendment guarantees criminal defendants the effective assistance of counsel. That right is denied when a defense attorney's performance falls below an objective standard of reasonableness and thereby prejudices the defense." <u>Yarborough v. Gentry</u>, 540

U.S. 1, 5 (2003) (per curiam) (citing <u>Wiggins v. Smith</u>, 539 U.S. 510, 521 (2003), and <u>Strickland v. Washington</u>, 466 U.S. 668, 687 (1984)). To establish ineffective assistance, a person must show that: (1) counsel's performance was outside the wide range of reasonable, professional assistance; and (2) counsel's deficient performance prejudiced the challenger in that there is a reasonable probability that the outcome of the proceeding would have been different absent counsel's deficient performance. <u>Strickland</u>, 466 U.S. at 687.

Notably, there is no "iron-clad rule requiring a court to tackle one prong of the <u>Strickland</u> test before the other." <u>Ward v. Hall</u>, 592 F.3d 1144, 1163 (11th Cir. 2010). Since both prongs of the two-part <u>Strickland</u> test must be satisfied to show a Sixth Amendment violation, "a court need not address the performance prong if the petitioner cannot meet the prejudice prong, and vice-versa." <u>Id.</u> (citing <u>Holladay v. Haley</u>, 209 F.3d 1243, 1248 (11th Cir. 2000)). As stated in <u>Strickland</u>: "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." 466 U.S. at 697.

"The question is not whether a federal court believes the state court's determination under the <u>Strickland</u> standard was incorrect but whether that determination was unreasonable - a substantially higher threshold." <u>Knowles v. Mirzayance</u>, 556 U.S. 111, 123 (2009) (quotation marks omitted). "If there is 'any reasonable argument that counsel satisfied <u>Strickland</u>'s deferential standard,' then a federal court may not disturb a state-court decision denying the claim." <u>Hittson v. GDCP Warden</u>, 759 F.3d 1210, 1248 (11th Cir. 2014) (quoting <u>Richter</u>, 562 U.S. at 105). As such, "[s]urmounting <u>Strickland</u>'s high bar is never an easy task." <u>Padilla v. Kentucky</u>, 559 U.S. 356, 371 (2010). "Reviewing courts apply a 'strong

presumption' that counsel's representation was 'within the wide range of reasonable professional assistance.'" Daniel v. Comm'r, Ala. Dep't of Corr., 822 F.3d 1248, 1262 (11th Cir. 2016) (quoting Strickland, 466 U.S. at 689). "When this presumption is combined with § 2254(d), the result is double deference to the state court ruling on counsel's performance." Id. (citing Richter, 562 U.S. at 105); see also Marshall, 828 F.3d at 1285 ("The standards created by Strickland and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so." (quotations and citation omitted)).

## IV. Analysis

As noted in Petitioner's counseled Reply, the only claim he is proceeding on is "that part of amended ground two of his petition which alleged that [Petitioner] was denied effective assistance of counsel based on his counsel's [failure] to timely present to the State his acceptance of the proposed plea agreement (which had capped his sentence at eighteen years imprisonment), which delay resulted in the State withdrawing the plea offer." Reply at 1. Specifically, Petitioner argues that he "signed a plea agreement of 0-18 years in prison 6 weeks prior to trial. Counsel untimely present[ed] to State Prosecutor the signed plea agreement [which] forced Petitioner to go to trial in which he was convicted as charged and was sentence[d] to life with a mandatory 25 years." Amended Petition at 11. Respondents contend that this ground is unexhausted, and they detail how Petitioner failed to "present the same claim through the state appellate process that he presented to the state post-conviction court." Response at 19. Respondents explain:

> Here, in Ground III of the Second Amended 3.850 motion, Petitioner alleged that his trial counsel was ineffective in misadvising him to reject the State's plea offer and proceed to trial because he would win at trial or would be found guilty of a

lesser offense. The state post-conviction court held an evidentiary hearing, at which [Petitioner] and former trial co-counsel, Ms. Dickens, testified addressing this claim. At evidentiary hearing, Ms. Di[c]k[e]ns testified that she and [Petitioner] had "[m]ultiple conversations" regarding possible plea bargains, she conveyed all plea offers to [Petitioner], and discussed possible outcomes and sentences he could receive if he went to trial, but did not urge him one way or the other, nor did she tell [Petitioner] to reject the zero to eighteen month [sic] plea offer because she felt he would win at trial.

. . . .

In his initial brief on appeal from his post-conviction motion, however, <u>Petitioner contended the exact opposite</u> as he did in his post-con[vi]ction motion. Instead of contending that counsel was ineffective in misadvising him to reject the State's offer, [Petitioner] argues that six weeks prior to trial he had agreed to <u>accept</u> the State's plea offer, but because counsel failed to timely notify the State of his acceptance, the State withdrew the offer which forced him to go to trial.

Response at 18-19 (internal record citations omitted). In the Reply, Petitioner urges this Court not to address the issue of exhaustion, because "[t]he State has <u>not</u> argued that this claim is otherwise procedurally barred due to lack of exhaustion (or other procedural default)." Reply at 8.

Upon review of the Response, the Court finds that Respondents sufficiently raised the exhaustion issue. <u>See</u> Response at 18-20 (detailing how Petitioner raised a different claim in his post-conviction appeal than he did in the trial court: "Similarly, Petitioner has failed to exhaust his claim of failing to convey the acceptance of the plea, as he never presented it to the post-conviction court."). Thus, the Court addresses exhaustion of this claim, and ultimately finds that Petitioner failed to exhaust the claim, the claim is procedurally barred, and Petitioner has not shown he is entitled to any exception to excuse the bar.

As detailed above, in his post-conviction motion filed in the trial court, Petitioner argued that his counsel was ineffective for improperly advising him to reject a proposed plea agreement for 1[11]-18 years' imprisonment. On appeal from the denial of that post-conviction motion, Petitioner argued that his trial counsel misadvised him regarding a plea agreement, and/or that he accepted the plea offer six weeks prior to his trial, but his counsel failed to present his acceptance to the State until two weeks before trial, which at that time, the State said it was too late. These are two separate claims, and Petitioner's failure to raise the same claim in the trial and appellate courts renders his claim unexhausted.[12] Petitioner cannot now return to state court and raise the claim, thus the claim is procedurally defaulted.

Petitioner argues that this Court should excuse the default based on Martinez, 566 U.S. 1. See Reply at 8-10. In Martinez,

> [t]he U.S. Supreme Court enunciated a narrow exception to the general rule that the lack of an attorney or attorney error in state post-conviction proceedings does not establish cause to excuse the procedural default of a substantive claim. The Supreme Court, however, set strict parameters on the application of this exception. It applies only where (1) state law requires a prisoner to raise ineffective-trial-counsel claims during an initial collateral proceeding and precludes those claims during direct appeal; (2) the prisoner failed to properly raise ineffective-trial-counsel claims during the initial collateral proceeding; (3) the prisoner either did not have counsel or his

---

[11] The proposed agreement was for zero to 18; this appears to be a typo.

[12] Petitioner even recognizes that he did not raise the instant claim in the trial court: "Although the state [trial] court was not considering the timeliness issue during the evidentiary hearing (and there has been no evidentiary hearing on this claim), the record from the evidentiary hearing on the 3.850 motion supports [Petitioner's] factual assertions. . . . Only incidentally to [Petitioner's] related plea claim about counsel's misadvice about whether to plea or not were some facts established that appear to support this claim, but because this claim was not before the State court, the facts were not sufficiently developed to conclusively resolve the issue." Reply at 4 (second emphasis added).

> counsel was ineffective during those initial state collateral proceedings; and (4) failing to excuse the prisoner's procedural default would result in the loss of a "substantial" ineffective-trial-counsel claim. The Supreme Court later extended <u>Martinez</u>'s rule to cases where state procedures, as a practical matter, make it "virtually impossible" to actually raise ineffective-trial-counsel claims on direct appeal. <u>Trevino</u>, 569 U.S. at - - - , 133 S. Ct. at 1918-21.

<u>Lambrix v. Sec'y, Fla. Dep't of Corr.</u>, 851 F.3d 1158, 1164 (11th Cir. 2017) (some citations omitted); <u>see</u> <u>Sullivan v. Sec'y, Fla. Dep't of Corr.</u>, 837 F.3d 1195, 1201 (11th Cir. 2016). According to Petitioner, his collateral counsel was ineffective for not raising the instant claim, because "a reasonably competent post-conviction counsel would on these facts have raised the claim and had it been raised there is a reasonable probability that the outcome of the proceeding would have been different, establishing cause and prejudice to excuse [Petitioner's] failure to present and exhaust the claim in State court." Reply at 10. As explained below, Petitioner is not entitled to <u>Martinez</u>'s limited exception.

To meet the third prong of the <u>Martinez</u> exception, Petitioner must show that his collateral counsel was ineffective during his initial state collateral proceedings. In Petitioner's pro se second amended Rule 3.850 motion, he raised five claims, including four claims of ineffective assistance of trial counsel. In ground three, Petitioner claimed that his trial counsel was ineffective for advising him to reject the proposed plea deal. Petitioner subsequently retained[13] collateral counsel, and his counsel filed a motion adopting Petitioner's pro se motion and adding three additional claims of ineffective assistance of trial

---

[13] The trial court referred to counsel as court appointed, Ex. P at 919, but counsel indicated he was retained, <u>id.</u> at 860.

counsel. Petitioner's collateral counsel, after reviewing the file,[14] could have reasonably chosen not to raise the instant claim, instead deciding that the other claims gave Petitioner the best chance to win. This is especially true because Petitioner's main argument was that his trial counsel was ineffective for advising him to reject the proposed plea, which would have been arguably inconsistent with the claim he is trying to assert now. See generally Raleigh v. Sec'y, Fla. Dep't of Corr., 827 F.3d 938, 958 (11th Cir. 2016), cert. denied, 137 S. Ct. 2160 (2017). Counsel's strategic decisions are due a "'heavy measure of deference,'" and "hindsight is discounted by pegging adequacy to 'counsel's perspective at the time.'" Rompilla v. Beard, 545 U.S. 374, 381 (2005) (quoting Strickland, 466 U.S. at 689, 691). Considering the record, the Court finds that Petitioner has not shown his collateral counsel's representation fell below an objective standard of reasonableness, and thus, counsel cannot be deemed ineffective for failing to raise this claim.

Moreover, Petitioner was not prejudiced by his collateral counsel's failure to raise this claim because the underlying claim is without merit. Even assuming that Petitioner's trial counsel was deficient, Petitioner cannot show prejudice. Generally, in the context of applying Strickland, to establish prejudice, a petitioner must show there is a reasonable probability that the outcome of the proceeding would have been different absent counsel's deficient performance. Strickland, 466 U.S. at 687. To show prejudice when a plea offer is rejected, a petitioner must demonstrate that "a reasonable probability [exists] that the plea offer would have been presented to the court (i.e., that the defendant would have accepted the plea and

_____

[14] Petitioner's collateral counsel filed two motions to continue the evidentiary hearing so that he had sufficient time to review the file and amend Petitioner's Rule 3.850 claims. See Ex. P at 860-61, 863-64.

the prosecution would not have withdrawn it in light of intervening circumstances), that the court would have accepted its terms, and that the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that in fact were imposed." <u>Lafler v. Cooper</u>, 566 U.S. 156, 164 (2012).[15]

It cannot be reasonably disputed that Petitioner initially rejected the proposed plea offer of zero-to-eighteen-years' imprisonment. One of Petitioner's pro se claims in his Rule 3.850 proceeding was that his counsel was ineffective for advising him to reject the offer, and Petitioner specifically acknowledged that "he rejected the plea" based on "[c]ounsel's affirmative misadvice." Ex. P at 819. In the Reply, Petitioner again acknowledges that he previously argued "that he had <u>earlier</u> rejected this (and other plea suggestions) based on his counsel's advice." Reply at 4. Petitioner's trial counsel testified at the evidentiary hearing:

> [A]t some point **months prior** to [the proposed plea agreement] actually being signed, we [(Petitioner's counsel and Mr. Heavener)] had as firm of a plea agreement as you could get between two attorneys for zero to 18, it was just under 20. **[Mr. Heavener] didn't unequivocally agree to it, but he said, if you get it signed and bring it to me today or tomorrow, I will show it to my superiors and I will try to encourage them to accept it**, but when I did that Mr. Toliver was not inclined to accept it at that time. **That went off the table.**

---

[15] The instant claim is not what is typically raised, which is, trial counsel failed to convey the State's plea offer to the defendant or provided the defendant with bad advice that caused him to reject the offer.

Ex. P at 78 (emphasis added). Whether this actually was a formal offer that the State would have ultimately agreed to is unclear,[16] but it makes no difference here because when it was presented to Petitioner, he rejected it.

Apparently at some later time, after Petitioner's son spoke with trial counsel regarding a plea deal, Petitioner changed his mind and wanted to enter into a plea agreement. According to Petitioner's testimony at the state court evidentiary hearing, the signed plea form was one that was created by his trial counsel in response to Petitioner's son speaking with trial counsel about coming up with a plea. In effect, Petitioner was attempting to revive the previously-rejected "offer." When Petitioner's counsel presented this deal to the State, it was rejected as being too late.

The gravamen of Petitioner's claim is with the timing of his counsel presenting the signed plea form to the State. Petitioner argues that he signed the form approximately six weeks prior to trial, but the form itself is dated approximately two weeks prior to his trial (April 11, 2006).[17] Petitioner's counsel testified at the state court evidentiary hearing that when she presented the signed form to the prosecutor, he rejected it as being too late.[18] Because this

_____

[16] Petitioner's trial counsel testified that the prosecutor would have had to get a supervisor to sign off on any plea deal.

[17] For reference, six weeks prior to Petitioner's trial date would have been about March 13, 2006. At that time, Petitioner had a motion to suppress pending. The state court held a hearing on the motion to suppress on March 29, 2006, and denied the motion on the record. Ex. C at 342. The State began filing motions in limine on about April 10, 2006, and Petitioner began filing motions in limine on about April 19, 2006. See Ex. A. The trial docket shows that there was a second amended information filed on about April 20, 2006, and Petitioner waived reading of the second amended information and entered a not guilty plea. See id.; see also Ex. C at 172-73. The trial commenced on April 24, 2006. See Ex. D.

[18] Trial counsel's testimony was as follows: "And so as trial neared, I think I brought up (continued...)

claim was not raised and it was not an issue on which the evidentiary hearing was being held, there was no clarification regarding the discrepancy between the date on the form (two weeks prior to trial) and when Petitioner says he signed it (six weeks prior to trial). Regardless, even if Petitioner had signed the agreement six weeks prior to his trial (despite the date on the agreement reflecting approximately two weeks prior to the trial) and his counsel presented it to the State at that time, Petitioner has not shown that the State would have agreed to such a disposition. Petitioner's trial counsel testified that the prosecutor needed to get a supervisor's approval with respect to any plea deal, and Petitioner cannot force the State to re-offer a plea deal once it has been rejected. Petitioner has not shown that a reasonable probability exists that the result would have been different but for counsel's alleged deficient performance. Because Petitioner's underlying ineffective-assistance-of-trial-counsel claim is unmeritorious, he was not prejudiced by collateral counsel's failure to raise it, and collateral counsel's failure to raise this ineffectiveness claim was not itself ineffective assistance of counsel. Petitioner has shown neither cause nor prejudice to excuse his procedural default.

In sum, Petitioner's claim is unexhausted and procedurally barred on federal habeas review. He has failed to show that he is entitled to an exception to the bar. Accordingly, it is

**ORDERED**:

---

[18](...continued)
let's just, I know Mac [(Heavener)] had rejected it because you didn't bring it at an earlier fashion. We can try one more time and see if he'll accept it, if you're so inclined. I never urged him one way or the other. I advised him on possible outcomes. And at that point, on the nearing of eve of trial, six weeks prior, Mr. Toliver wanted to sign, and when I took it to [Mr. Heavener,] he said it's too late." Ex. P at 967.

1.     The Amended Petition (Doc. 25) is **DENIED**, and this case is **DISMISSED with prejudice**.

2.     The Clerk shall enter judgment dismissing this case with prejudice, terminate any pending motions, and close the file.

3.     If Petitioner appeals this Order, the Court denies a certificate of appealability.[19] Because this Court has determined that a certificate of appealability is not warranted, the Clerk shall terminate from the pending motions report any motion to proceed on appeal as a pauper that may be filed in this case. Such termination shall serve as a denial of the motion.

**DONE AND ORDERED** at Jacksonville, Florida, this 21st day of November, 2018.

TIMOTHY J. CORRIGAN
United States District Judge

---

[19]     This Court should issue a certificate of appealability only if Petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To make this substantial showing, Petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," Tennard v. Dretke, 542 U.S. 274, 282 (2004) (quoting Slack v. McDaniel, 529 U.S. 473, 484 (2000)), "or that the issues presented were 'adequate to deserve encouragement to proceed further,'" Miller-El v. Cockrell, 537 U.S. 322, 336 (2003) (quoting Slack, 529 U.S. at 484). "Where a district court has rejected the constitutional claims on the merits, . . . [t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." Slack, 529 U.S. at 484. However, when the district court has rejected a claim on procedural grounds, the petitioner must show that "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." Id. After consideration of the record as a whole, the Court will deny a certificate of appealability.

25

JAX-3 11/19
c:
James L. Toliver, #J09505
Counsel of Record